## ST. REGIS PAPER COMPANY, Plaintiff-Appellee,

v.

## BEMIS COMPANY, INC., Defendant-Appellant.

### No. 76–1044.

United States Court of Appeals, Seventh Circuit.

Heard June 16, 1976.

Decided Feb. 3, 1977.

Rehearing and Rehearing En Banc Denied March 17, 1977.

Irving Powers, John K. Roedel, Jr., St. Louis, Mo., for appellant.

Raymond J. McElhannon, Norman H. Zivin, Clyde H. Haynes, New York City, William T. Rifkin, Chicago, Ill., for appellee.

Before SWYGERT, CUMMINGS and PELL, Circuit Judges.

SWYGERT, Circuit Judge.

The outcome of this appeal turns on the validity of United States patent 3,650,460 and reissue patents 28,317 and 28,318. All three patents claim the invention of specialized bags which prevent leaking and sifting

better than previously existing bags. We do not find the bags to be nonobvious within the meaning of 35 U.S.C. § 103, and therefore reverse the judgment of the district court which held the patents valid.

I

The subject of patent 3,650,460 (hereinafter the "Lokey" patent) is best described by reference to Figure 1.

A-1

Fig. 1.

It is a bag of tubular form consisting of several contiguous layers of flexible sheet material, such as paper. The bag is creased to provide a bellows effect so that it will lie flat until filled. Each of the panels formed by the crease is called a "gusset." The rear surface of the bag is longer at the top than the front surface, allowing the rear surface to be folded over and glued to the front surface, thereby closing the top of the bag.

The bag is closed at the bottom in the same manner,* and is therefore a "pinch bottom" bag.

The front gusset panel or portion of each bag is longer than the front surface of the bag. The rear gusset panel is correspondingly longer than the front gusset panel, and the rear of the bag is longer than the rear gusset panel. Accordingly, the parties referred to the Lokey bag as a "three-step" bag. The three-step nature of the bag allows for better sealing, because the top of each gusset panel, as well as the top of the rear of the bag, can be glued to the front of the bag.

The reissue patents (hereinafter "Goodrich '317" and "Goodrich '318") cover refinements of the Lokey bag. In '317, the layers of the bag are cut flush with each other at the top of the gusset panels, but are ascendingly stepped at the top of the front and rear surfaces. See Figure 3. In '318, the layers are stepped both at the top of the front and rear surfaces, and at the top of the gusset panels. See Figure 4.

A-2

Fig. 2.

BAG PLIES FLUSH CUT IN FRONT & REAR SURFACE PORTIONS

BAG PLIES FLUSH CUT IN FRONT & REAR GUSSET PORTIONS

Fig. 3.

BAG PLIES STEPPED IN FRONT AND REAR SURFACE PORTIONS

BAG PLIES FLUSH CUT IN FRONT & REAR GUSSET PORTIONS

Fig. 4.

BAG PLIES STEPPED IN FRONT AND REAR SURFACE PORTIONS

BAG PLIES STEPPED IN FRONT & REAR GUSSET PORTIONS

* At the bottom of the bag the front surface is longer than the rear surface so that closure is achieved by folding the front surface over the rear surface. See Figure 1.

The stepping of the layers allows each layer to be individually attached to the front surface when the bag is closed, further preventing leaking or sifting. *Compare* Figure 5 (Lokey patent—flush cut layers) *with* Figure 6 (Goodrich '318 reissue patent— each layer stepped). In addition, both reissue patents call for the bag end to be sealed by a preapplied reactivatable bonding agent known as hot melt adhesive rather than by the application of glue after the bag is filled.

A-3

Fig. 5.

A-4

Fig. 6.

BODY OF BAG

REAR GUSSET PANEL  FRONT GUSSET PANEL

REAR WALL

BAG PLIES UNATTACHED IN BODY OF BAG

FRONT WALL

BAG PLIES BONDED TOGETHER AT WALL AND GUSSET ENDS

REAR WALL TERMINATION

ADHESIVE BONDS

REAR GUSSET PANEL TERMINATION

REAR WALL

FRONT GUSSET PANEL TERMINATION

FRONT WALL TERMINATION

AXIS OF CLOSURE

Appellee St. Regis is the owner of the Lokey patent and was the owner of Goodrich and Waxlax United States patents 3,687,356 and 3,776,451, which incorporated improvements on the Lokey patent. It filed suit against appellant Bemis for infringement of those patents on April 9, 1973. At the close of trial, the Goodrich reissue patents '317 and '318 were substituted for the original Goodrich and Waxlax patents. The district court entered a decision holding all three patents valid and

infringed on November 12, 1975. Bemis now appeals from that decision, contending both that the patents are invalid because they were obvious extensions of the prior art and that St. Regis should be estopped from bringing an infringement action because the Patent Office was not fully informed about the prior art when it granted the patents. Because of our resolution of the first issue, we do not reach the second.

## II

35 U.S.C. § 103 states that "a patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." The Supreme Court has held that section 103 was intended to codify the requirement of nonobviousness that had been formulated by courts beginning with *Hotchkiss v. Greenwood*, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1851). *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). These courts have refused to uphold the validity of a patent if "the improvement is the work of the skilful mechanic, not that of the inventor." *Hotchkiss*, 52 U.S. (11 How.) at 267, 13 L.Ed. 683.

Moreover, the Supreme Court has recently indicated that section 103 cannot easily be satisfied by inventions that rearrange old elements in new combinations with each element performing the same function it performed in the prior art, even though the new combination produces a more striking result than the old ones. *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976). Unless the combination is "synergistic, that is, 'result[ing] in an effect greater than the sum of the several effects taken separately,'" it cannot be patented. *Id., citing Anderson's —Black Rock v. Pavement Co.*, 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969).

## III

■ It is with these considerations in mind that we must determine whether the three patents at issue are valid. We note that under 35 U.S.C. § 282 an issued patent is to be presumed valid. The district court relied heavily on this presumption in upholding the validity of the three patents. However, this presumption is rebuttable rather than conclusive. It cannot stand in the face of compelling contrary facts. *See, e. g., American Infra-Red Radiant Co. v. Lambert Industries, Inc.*, 360 F.2d 977, 989 (8th Cir.), *cert. denied*, 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966); *Groen v. General Foods Corp.*, 402 F.2d 708, 711 n. 2 (9th Cir. 1968). The question of patent validity is ultimately one of law and we must examine the facts ourselves in determining whether the standard of section 103 has been met. *See Graham v. John Deere Co.*, 383 U.S. at 17–18, 86 S.Ct. 684.

### A. THE LOKEY PATENT

The Lokey bag consists of four elements: (1) it has gussets; (2) it uses a pinch bottom; (3) it has the three-step feature at the top and bottom; and (4) it has multiple layers. Bemis argues that Poppe patent 2,209,901, issued by the Patent Office in 1940, incorporates a bag with the first three elements of the Lokey bag. An examination of the Poppe patent shows that this claim is correct. *See* Appendix A.

Bemis has further demonstrated that the fourth element of the Lokey bag, its use of multiple layers to achieve the effect of many bags within one, has been known in the bag industry for many years. In fact, St. Regis admitted during the course of litigation that it has sold gusseted multiwall bags in the United States since the early 1930's.

■ Therefore, the Lokey bag is only entitled to a patent if the fusion of the old elements that comprised the Poppe patent and the old element of multiple layering created a synergistic combination. We hold that it did not do so. While the addition of

multiple plies to the concept of the Poppe bag undoubtedly made it stronger and even may have been necessary to make this type of bag commercially feasible, it is not the type of innovation for which a patent monopoly is to be granted. It is difficult to conceive of a more obvious method of strengthening a certain type of bag than putting one bag inside of another.

■ St. Regis asserts that the Poppe patent should not be accepted as prior art because the method for manufacturing the Poppe bag suggested in that patent was unworkable. We disagree. Whether the method of construction suggested by the Poppe patent was unworkable is irrelevant to the resolution of this case. Poppe patented a bag, not a method for manufacturing that bag, and the finished product disclosed in the Poppe patent constitutes prior art which must be compared with the Lokey patent to determine whether the Lokey bag was a nonobvious advance.

## B. THE GOODRICH REISSUE PATENTS

■ The two features of the Goodrich '317 and '318 patents that distinguish them from the Lokey patent are the progressive stepping of the plies and the use of hot melt adhesive. We hold that neither element is sufficiently nonobvious to sustain the validity of the reissue patents under section 103.

The concept of stepping the plies of a multilayered bag is revealed in Windmöller and Hölscher French patent 1,227,176. See Appendix B. While the Windmöller bag was not gusseted and did not call for the stepping of all of the plies, the transition from the Windmöller bag to one which was gusseted and had all of the plies stepped was not a difficult one for one skilled in the art of manufacturing bags. Moreover, the transition from the Lokey bag to the reissue bags would not have required great inventive flair for a person skilled in the art. The stepping of all of the plies was the work of a skillful mechanic rather than an inventor, and therefore their incorporation in the reissue bags is not entitled to patent protection under the standard of Hotchkiss v. Greenwood.

Similarly, the use of hot melt adhesive in the reissue bags did not create a synergistic combination. As St. Regis admitted at oral argument, hot melt adhesive is well known in the art, and its use in place of glue did not transform Goodrich '317 and '318 into concepts which had effects greater than the sum of the effects produced by the old elements on which they were based.

The judgment of the district court is reversed and the cause remanded for further proceedings consistent with this opinion.

PELL, Circuit Judge, dissenting.

The multiple and complex issues presented by this appeal were painstakingly and critically addressed and disposed of by the district court in arriving at the conclusion that the patents in issue were valid and infringed. St Regis Paper Company v. Bemis Company, Inc., 403 F.Supp. 776 (S.D. Ill.1975). I am satisfied that not only were the district court's findings of fact not clearly erroneous but that the district court reached the correct result for substantially the correct reasons. I therefore would adopt that opinion as the opinion of this court. I therefore respectfully dissent.

I must add it strikes me that an unfortunate result of the majority opinion may well be to chill truly inventive combinations which should be as much entitled to patent protection as are the increasingly rare completely "new under the sun" inventions.

Appendix A to follow.

Patented July 30, 1940

2,209,901

# UNITED STATES PATENT OFFICE

2,209,901

**METHOD OF MAKING SIFTPROOF BAGS**

George W. Poppe, Brooklyn, N. Y.

Original application September 15, 1937. Serial
No. 165,693. Divided and this application
April 7, 1939, Serial No. 266,478

3 Claims. (Cl. 93—35)

This invention relates to a method of producing a siftproof bag of the character known in the art as a gusset, bellows fold, or square bottom bag and is a division of my application. Serial Number 165,693, filed September 15, 1937.

A primary object of the invention is the production of a siftproof bag of the character above set forth by a method which enables it to be made at a high rate of speed by known bag machinery. Since the method in commercial production is practiced on a bag machine, it will best be understood when described in connection with such machine.

In the accompanying drawings,

Figure 1 is a top plan view of portions of a bag machine of known construction, and showing how a web of paper is cut and folded into a tube, from which bag sections are successively formed;

Figure 2 is a bag section, after severance from the tube, but prior to folding over of the bag bottom;

Figure 3 is a perspective view showing the bag in partly opened condition to more clearly indicate its general construction; and

Figure 4 is a side elevation, partly broken away, of so much of a machine of known construction as will sufficiently illustrate how my method is practiced and the bag produced at the high speed necessitated by commercial requirements.

In order that the description may accord with that of the parent case, I have used the same reference characters to designate the same parts in the present divisional application as in the parent case.

Referring to Figures 1 and 4, a web of paper 11 carried by a roll 12 passes from said roll over suitable guiding rollers 13, and about a roller 14 where the edge of the web receives a line of paste indicated at 15, Figure 1 and supplied by a disc 16, Figure 4 which dips into a paste pot 17. From the roller 14 the web passes over another roller 18 made of rubber or similar material and as it passes over said roller the web is perforated by a serrated edge knife carried by a cylinder 20. For convenience, in manufacture and assembly, the knife is preferably made in sections and each section may be independently adjustable in the cylinder 20, although, of course, a knife might be constructed in one piece and shaped as shown.

Assuming a sectional construction, the center section 22, Figure 1 makes a series of perforations in the web which determine the top and bottom edges of the plain wall of a bag portion prior to folding the bottom. Sections 24, adjacent the section 22 form the top and bottom edges of one ply of the bellows fold. The sections 24 are in alignment with each other but are stepped from the section 22. The sections 26 are likewise in alignment with each other but are stepped from the sections 24, these sections 26 forming the top and bottom edges of the other ply of the bellows fold. Sections 28 are in alignment with each other but each stepped from the adjacent section 26 and form the bottom and top edges of the seam wall of the bag when the web is folded into a tube. The lines of perforations 22a, 24a, 26a and 28a, Figure 1 show the condition of the web after the knife sections correspondingly numbered, have acted upon it as the web passes over the roller 18.

After the web is perforated as above described, it passes under a roller 30, Figure 4 and under a former 32 about which it is folded by the usual mechanism to produce bellows folds between the bottom plain wall 1, Figure 3, and the upper seam wall 2. The seam wall is produced by folding the pasted portion 15 over onto the opposite longitudinal edge of the web as indicated in the lower portion of Figure 1.

The folded tube and web are fed through the machine by means of the usual feed rollers 34, Figure 4, from which rollers the tube passes over the clamp cylinder 36 having the usual clamps for receiving the bottom folded portion of the tube, such fold being produced by the usual tucker blade 38 carried by a roller 40. This roller also carries one or more paste bars 42 which supply the paste to the seam wall of the bag just after the action of the tucker blade to tuck the end of the tube into the clamp. The cylinder 36 is rotated in such a manner that the peripheral speed is greater than the peripheral speed of the feed rollers 34 and therefore when the tucker blade tucks the end of the bag tube into the clamp a bag tube section is severed from the main tube. A severed section is indicated at the lower portion of Figure 1 which also shows the bottom of the section folded over and pasted, thereby forming the completed article. Figure 2 shows a section somewhat enlarged from that shown in Figure 1 and prior to the pasting of the bottom. The line of fold, however, is shown along the line a—a and the paste area is indicated by the reference character 6.

In the completed bag therefore the lower edge of each ply of the bellows fold indicated at 4. Figures 2 and 3 is off-set from the lower edge of each ply of the fold 3 and may therefore be pasted down onto the seam wall 2 of the bag. The end of the plain bag wall indicated as 7 is

likewise offset from the edges of the bellows fold 3 and is pasted down on the seam wall. The lower edge of the seam wall is folded over on itself and this edge is offset from the edges 4.

It will be noted that the paste area 6, extends from a position below the edge of the turned-over portion 5 and almost to the end of the turned-over portion 7, and that the ends of both bellows folds as well as the fold 5 are pasted onto the seam wall. With this construction a thoroughly sift-proof bag of the bellows type is produced.

The machine may be driven by a motor indicated diagrammatically at 44 having a transmitting shaft 46 on the end of which is a bevel gear 48 meshing with a smaller bevel gear 50 on a shaft 52 which carries suitable gears for driving the clamp cylinder 36 at the proper speed.

A stub shaft 54 also projects from the motor casing and through suitable gears drives a chain 56 whereby the cylinder 20 carrying the knives is driven once for each bag to be produced.

The machine being well known has not been described in detail but its general operation only is set forth in order that a practical manner of practicing my method may be sufficiently disclosed.

It is to be understood, however, that variations may be resorted to in the method and machinery used provided such variations are within the scope of the invention and without departing from the spirit thereof.

What I claim is:

1. The method of making a bellows fold sift-proof bag which consists in perforating a continuously advancing web of paper, along transverse lines, said lines defining the ends of a section that is to constitute a bag, the transverse perforations defining the ends of each adjacent plies of bellows fold being off-set from each other and also off-set from the perforations defining the walls of a bag section to which each is adjacent, folding the web into a bellows tube, severing a section from the tube along said perforated lines, and closing the bottom of the section to complete the bag.

2. That step in the process of forming a bellows fold siftproof bag which consists in making perforations in a continuously advancing web of paper, along transverse lines which lines define one end of the plies of the bellows fold, the lines defining the end of one ply of each fold being off-set from the end of the other ply of the fold.

3. Those steps in the process of making a bellows fold siftproof bag which consists in making perforations in a web of paper along transverse lines which lines define one end of a bag wall and one end of the plies of the bellows fold, the lines defining the end of one ply of the bellows fold being offset from the other ply of the fold, the ends of both plies being off-set from said line defining the end of the bag wall.

GEORGE W. POPPE.

## CERTIFICATE OF CORRECTION.

Patent No. 2,209,901.                                   July 30, 1940.

### GEORGE W. POPPE.

It is hereby certified that the above numbered patent was erroneously issued to the inventor, said "POPPE" whereas said patent should have been issued to—Equitable Paper Bag Co. Inc., of Brooklyn, New York, a corporation of New York—, as assignee of the entire interest therein, as shown by the record of assignments in this office; and that the said Letters Patent should be read with this correction therein that the same may conform to the record of the case in the Patent Office.

Signed and sealed this 8th day of October, A.D. 1940.

Henry Van Arsdale,
Acting Commissioner of Patents.

(Seal)

842

DEFENDANT'S EXHIBIT 29

Jan. 30. 1940.                    G W POPPE                    2,209,901

Original filed Sept. 16, 1937    2 Sheets-Sheet 1

*Fig. 1.*

*Fig. 2.*

*Fig. 3.*

Inventor

George W. Poppe

By Geo. M. Drew

Attorney

Fig 4.

Inventor

George W. Poppe
by Geo. M. Dow.
Attorney

## APPENDIX B

French Patent No. 1,227,176

P.V. No. 797,824. International Classification: B 31 b

*Paper bag with welded internal sheet, and manufacturing device*

Company known as: Windmoeller and Hoelscher, resident of Germany

Filed June 18, 1959 at 1:57 p. m. at Paris

Issued February 29, 1960—Published August 19, 1960

(Patent application filed in German Federal Republic on May 15, 1959, in the name of the Applicant.)

The invention relates to a paper bag, preferably formed of several sheets of paper, the innermost of which is provided on its interior face with a lining of polyethylene or similar synthetic material, with the aid of which this inter-

nal sheet can be welded in order to obtain a bag that is absolutely impermeable to moisture.

One difficulty in the manufacture of such a bag resides in the embodiment of the welding of the internal sheet. For the longitudinal welding of the bag on the internal sheet, a device has already been proposed, which makes it possible in the course of the normal formation of the tube, to weld a folded-over border of the internal sheet with the other border of this same sheet, applied to the first. But when we wish to close the bottom of the bag with the tubular elements thus obtained, we are obliged to make the heat, required for the welding, pass through the other, exterior sheets of paper, which requires considerable time if we do not wish to risk burning the said exterior sheets.

The object of the invention is the elimination of these drawbacks, and the embodiment of a bag, as well as a manufacturing process for this bag, and a device for application of this process. It makes it possible to execute, quickly and surely, the welding of the bottom of the bag, with no danger to the exterior sheets, and furthermore, it makes it possible to obtain a very solid sealing of the bottom with the aid of the other sheets.

The bag according to the invention is characterized in that the internal sheet terminates, at both ends of the bag, flush with the upper and lower side, while the other sheets, on the upper side, at one end of the bag, and on the lower side at the other end of the bag, become progressively shorter than the internal sheet, going from the interior toward the exterior, at each of the corresponding opposite ends of the side of the bag.

Preferably, the sheets of paper and the welded end of the internal sheet, at the end of the bottom and/or of the head of the bag, are folded over and glued, directly below the edge of the side of the nearest interior sheet, shorter than the internal sheet, on the sides, which are likewise shorter, of the other sheets.

Furthermore, the sheets of paper and the lower part of the welded end of the internal sheet, at the end of the bottom and/or of the head of the bag, are folded over and glued along a line passing substantially through the center of the welded end of the internal sheet, on the upper part of the welded end of the internal sheet, and on the shorter side of the other sheets.

Finally, the welded end of the internal sheet, at the end of the head of the bag, is advantageously folded over in known fashion and inserted between the internal sheet and the side, shorter than the latter, of the nearest interior sheet, and the sides of the sheets, longer at this end than the internal sheet, are folded over and glued on the shorter sides.

The manufacturing process which constitutes another object of the convention, is remarkable for the fact that the tubular sections, obtained in the manner known in itself by preliminarily weakened places and longitudinal incisions of the widths formed by the various sheets of the bag, by transverse and longitudinal glue zones, application of the sheets on one another, shaping of the tube and separation on the lines of preliminary weakening, are first provided with their bottom weld by the transverse band process, then with a preliminary bottom rupture line, the bottom subsequently being glued, then folded over.

The device for application of the process, which likewise constitutes another object of the invention, is remarkable for the fact that it comprises a device for longitudinal welding, a device for pre-grooving, a gluing device and a device for folding over, which are disposed in succession along a device for convey-

ing the material. We can advantageously provide the longitudinal welding installation in the form of a complementary station mounted in a transverse-band, base-positioning machine of known type, in which the grooving, gluing and folding stations, as well as the material conveyor device, according to the invention, are the only ones used, the other work stations of the machine being left idle.

One method of embodiment of the invention is set forth in detail by way of example in the description below, accompanied by the attached drawing in which:

Fig. 1 is a view showing a tubular section constituted by three sheets of paper and designed for the manufacture of a bag according to the invention.

Fig. 2 is a view showing the three sheets, composing the tubular section represented in fig. 1, spread out side by side.

Fig. 3 is a diagrammatic lateral view of a device designed for the obtention of tubular sections according to figs. 1 and 2.

Fig. 4 shows the successive phases of embodiment of the tubular sections in the device represented in fig. 3.

Fig. 5 is a diagrammatic lateral view of a device designed for the embodiment of the bottom seal of tubular sections according to fig. 1.

Fig. 6 shows the successive phases of embodiment of the bottom seal in the device represented in fig. 5.

Fig. 7 is a view in section, taken along line A–B, of a bag provided with its bottom seal according to fig. 6.

Fig. 8 is a view in section, similar to fig. 7, but showing another method of sealing the bottom.

Fig. 9 is a view in section, similar to fig. 7, but showing the terminated seal at the head of a full bag.

The tubular section represented in fig. 1 is composed of three sheets 1, 2 and 3 (see also fig. 2). Sheet 1 is the innermost sheet and it is equipped on the face visible in fig. 2, constituting the interior of the bag, with a lining 4 of synthetic material such as, for example, polyethylene or similar material. The internal sheet 1 has straight-cut ends 5 and 6 and, with the aid of fold lines 7 and 8, which will later form the lateral borders of the tube, is folded to form a tube and closed with the aid of a longitudinal weld 9 (fig. 1) executed in any manner known in itself by welding the lining made of synthetic material and/or by gluing the paper surfaces. The middle part 10 of the sheet 1, situated between the fold lines 7 and 8 (fig. 2) here forms the under part of the tube, and the lateral parts 11 and 12, outside the fold lines 7 and 8, form the upper part of the tube, on which the longitudinal weld 9 is disposed.

The next interior sheet 2, which is constituted, for example, by kraft paper, has, at its ends, borders cut in steps 13, 14 and 15 on the one hand, and 16, 17 and 18 on the other hand, whose shoulders respectively 19 and 20, and 21 and 22, correspond to the future lateral fold lines 7' and 8', so that the under part 23 of the tube, situated between fold lines 7' and 8', forms, with its lower end, a step 17 which projects from the internal sheet 1, past its lower edge 6, and lateral parts 24 and 25 which form the upper part of the tube, and which are situated on the outside of the fold lines 7' and 8', have lower edges lying with the lower edge 6 of the internal sheet 1, as we can see in fig. 1. The steps 13, 14 and 15 at the upper end of sheet 2, are exactly identical to steps 16, 17 and 18 provided on its lower end, and they are likewise disposed with the same equal distance between them as upper end 5 is from the

lower end 6 of internal sheet 1, so that at the upper end of the tube, layer 2, with its upper edge 14, presents a recess, equivalent, within the upper 5 of sheet 1, to the projection which step 17 forms beyond edge 6. Likewise, the upper steps 13 and 15 of the upper side of the tube, project beyond the upper edge 5 of the sheet 1 by an amount equal to the recess presented by the lower steps 16 and B within the lower edge 6 of sheet 1. Sheet 2 of the tube is closed with the aid of a longitudinal weld 26 (see fig. 1).

With respect to the exterior sheet 3, the same disposition is repeated, with the difference that the underpart 27 with its lower edge 28, again forms, beyond lower step 17 of sheet 2, a projection equivalent to the projection which step 17 forms relative to the lower edge 6 of sheet 1. Inversely, the upper part of exterior sheet 3, formed by the lateral parts 29 and 30, presents, with its edges 31 and 32, an equivalent recess within the lower steps 16 and 18 of sheet 2. Consequently, at the upper end of the tube, the upper part of the tube constituted by lateral parts 29 and 30, forms, with its edges 33 and 34, beyond the upper steps 13 and 15 of the sheet 2, a projection equivalent to the recess presented by the upper edge 35 of underpart 27 of the tube relative to the upper step 14 of the under part of sheet 2. The exterior sheet 3 is closed with the aid of a longitudinal weld 36. The shoulders of the edges coincide, again, with the lateral fold lines 7″ and 8″.

By means of the cut, as just described, given to the exterior sheets 2 and 3, we obtain the arrangement such that the internal sheet 1 remains apparent, presenting a strip 37, 38 respectively (fig. 1) with the same width as the spaced steps, so that we can weld the inner lining 4 to the interior of this strip, and the heat can now be added from the side remaining open, and only through internal sheet 1. When the interior bag has thus been sealed absolutely tight, we impart mechanical strength to the bag by folding and gluing the sheets of the bag, an operation which, according to the invention, can be carried out in two different ways:

According to the first process, the folding edge of the bottom is provided immediately below steps 16 and 18 of the middle sheet 2. Fig. 7 shows, in section, a bottom seal produced in this way. The internal sheet is closed by a weld 39 and the lower part thus closed is folded around steps 16 and 18 of intermediate sheet 2, and glued to the latter with the aid of glue zone 40. The still projecting parts 2 and 3 are glued, with the aid of glue zones 41 and 42, to the recessed part of exterior sheet 3.

According to another process according to the invention, the fold line 43 of the bottom (see fig. 8) is provided in the middle of the welded strip 37 of the tube formed by sheet 1, and strip 37, thus doubled, is glued to itself with the aid of a glue zone 44. If we simultaneously fold the projecting borders of sheets 2 and 3, each of these borders will be placed, each time, on the top border of the same sheet, so that with the aid of glue zones 45 and 46, the sheets are glued to themselves, imparting remarkable solidity to the bottom of the bag.

The sealing of the head of the filled bag, whereof the disposition of the sheets before filling is represented at the top in fig. 7, can be executed, generally speaking, in the same way as the sealing of the bottom, but, in view of prevalent custom, we operate as shown in fig. 9, in a way which differs in that the welded strip 38 of internal sheet 1 is inserted between this sheet and the next intermediate sheet. The projecting borders of sheets 2 and 3 are provided with glue zones 47 and 48 are glued on the

opposite side of the bag, the intermediate sheet 2 being glued both to itself and to sheet 3.

The various sheets are protected against a shift in the longitudinal direction with the aid of transverse glue zones applied to the ends of the bag, which also insures the correct opening of the bag; thus we apply, to the interior face of sheet 2, in the vicinity of the bottom of the bag, glue zones 49 and 50 (ss fig. 2, 7, and 8), with the aid of which the intermediate sheet 2 finds itself glued to the internal sheet 1. On the interior face of exterior sheet 3, glue zones 51 and 52 are applied in the vicinity of the bottom of the bag, and with the aid of these, the exterior sheet 3 is glued to the intermediate sheet 2. At the head end of the bag, exterior sheet 3 is provided, on its interior face, with glue zones 53 and 54 (see fig. 2, 7 and 9), with the aid of which it is glued to the intermediate sheet 2. The interior sheet 2 is provided, for the embodiment of the seal of the head of the bag, according to fig. 9, only with transverse glue zones 55 applied to the upper part of the bag, and with the aid of which this sheet is glued to internal sheet 1. The internal side of the bag has been left free of glue zones, in order to be able to insert the welded border of internal sheet 1 between sheet 1 and sheet 2. If we terminate the sealing of the head of the bag in a manner similar to that represented in fig. 7 and 8, the sheet 2 can likewise be provided at its upper end with a continuous transverse glue zone.

The number of sheets composing the bag is not limited to three. If we use more sheets we will advantageously provide other steps, or we will make up a sheet 2 or a sheet 3 actually formed of several sheets.

In the manufacture of bags according to the invention, we start by embodying the tubular sections according to fig. 1 with the aid of a machine suitable for the formation of tubes. By starting, for example, with three feed spools 56, 57 and 58, designed respectively for the embodiment of widths 1', 2' and 3', we will draw these widths with the aid of an advancing device 59, 60 and we will first make them pass over perforator devices 61, 62 and 63. The perforator device 61 is provided, for the obtention of a continuous line of less resistance 64 (fig. 4) in the upper width 1', with a continuous serrator 65. The perforator device 62 has three serrators 66, 67 and 68, disposed in two different planes, and designed to obtain, in the middle width 2', a line of less resistance comprising steps 69, 70 and 71. In the same way, perforator device 63 is provided with three serrators 72, 73 and 74, disposed in two planes, the spacing of which is more pronounced, and is designed to obtain, in the lower width 3', a line of less resistance forming more marked steps 75, 76 and 77.

In addition, the perforator devices 62 and 63 have, between the ends of the serrators, longitudinal knives 78 and 79 respectively, designed to embody longitudinal connecting slots 80 and 81 in width 2', and 82 and 83 in width 3' between the lines of less resistance of the steps.

As they leave the perforator devices, the widths 2' and 3' are passed, respectively, in a transverse gluing device 84 and 85 for the application of gluing strips 49 to 55, according to fig. 5, on both sides of the lines of less resistance of the steps, which correspond exactly to the contours of the end of the steps in sheets 2 and 3.

With the aid of guide rollers 89, 90 and 91, we will ensure that the lines of weakening which succeed one another in the various widths, at an interval corresponding to the length which we wish to impart to the bag, will be superposed correctly with the interval provided for

the steps. In addition, the widths which, to the left in fig. 4 have been represented separately, one above the other, only for the sake of simplicity, are guided, offset laterally relative to one another, from the feed rolls, likewise offset mutually, to the collecting station, so that they arrive, as shown by the middle of fig. 4, with their lateral borders offset, so that the longitudinal gluing lines 9, 26 and 36, can be executed underneath in device 92 on the offset borders.

Then, with the aid of a tube shaping device 93, the tube is shaped by bringing the lateral parts of the assembled widths over one another and gluing the longitudinal gluing strips to the opposite and offset borders of the widths, in the course of which operation we proceed, where the case applies to the hot gluing of the lining of width 1′ made of synthetic material.

Behind the advancement device 59–60 there is disposed a pair of breaking cylinders 94–95, rotating at high speed, which separate in turn each tubular section 96 along the lines of less resistance in the tube which is continuously being fed out, and which is held by the advancement device 59–60. The tubular sections are then stacked in a collector 97.

For the embodiment of the bottom seal, the tubular sections 96 (see fig. 6) are separated mechanically in any manner known in itself, for example with the aid of clips 100 and 101 mounted on two chains 98 and 99, first directed toward a welding device 102 (see fig. 5), where the weld 39 is embodied on the projecting end 37 of the internal tube 1. The welding device preferably consists of a resistance 103, in a thin strip disposed in the direction of movement and whereof the two ends, which are insulated and fixed, are provided with current feeds 104 and 105. The resistance strip, whose length can be determined as desired according to the necessary amount of heat to be applied, is, in view of its small mass, easy to adjust to the temperature which will insure a uniform weld.

As they leave the welding device, the tubular sections pass into a press device 106–107 in which the lining of synthetic material, having become adhesive, is glued by means of a suitable clamping pressure, to the interior of the two internal tubular sides. We can then provide, where applicable, a cooling device 108 designed to impart the necessary rigidity to the glue zone by cooling, so that in the course of the subsequent phases of operation, the weld will not open up, or so that the two sheets, during the folding, will not shift accidentally. Then comes a longitudinal grooving device 109, 110 in which a preliminary fold line 111 is made for the bottom seal. By lateral adjustment of the members 109 and 110, line 111 can be provided either as represented in the drawings, on steps 16 and 18 of the recessed upper tubular side, of the intermediate sheet, or in the middle of the welding strip 37.

Then there is a gluing device 112, designed to embody the gluing zones 40, 41 and 42 on the borders of the sheets to be folded over.

Finally, the tubuler sections pass into a folding device 113 in which the sealing of the bottom is produced, as shown by fig. 6, along the fold line 111.

In a manner not shown, the tubular sections can then be taken, between conveyor belts exerting a certain pressure on them in order to complete the gluing of the bottom, toward the storage point.

It is likewise possible to use, as bottom shaping apparatus, a bottom shaping machine with transverse advance, of

known type, to which we add, ahead of the grooving station, a longitudinal welding device such as the one represented, for example, in fig. 5. The unwanted working stations on such a machine are left in idle position, and only the grooving, gluing and folding devices are actuated.

*Resume*

The object of the invention is:

1) A paper bag, formed of several sheets, with weldable internal sheet, having the following characteristics, considered separately or in combination:

The internal sheet terminates, at the two ends of the bag, flush with the upper and lower side, while the other sheets, above one end of the bag and below the other end of the bag, become progressively shorter than the internal sheet, going from the interior to the exterior, but the said sheets become progressively longer than the internal sheet, going from the interior to the exterior, at each of the corresponding opposite ends.

The sheets of paper and the welded end of the internal sheet, at the end of the bottom and/or of the head of the bag, are folded over directly below the edge of the side of the nearest interior sheet which is shorter than the internal sheet, and glued on the, likewise shorter, side of the other sheets.

The sheets of paper and the lower part of the welded end of the internal sheet, at the end of the bottom and/or of the head of the bag, are folded over along a line passing substantially through the middle of the welded end of the internal sheet on the upper part of the welded end of the internal sheet, and glued on the shorter sides of the other sheets.

The welded end of the internal sheet, at the head end of the bag, is folded over on itself in known manner, and inserted between the internal sheet and the side, shorter than the latter, of the nearest interior sheet and the sides of the other sheets, longer at this end than the internal sheet, are folded over and glued on the shorter sides of these same sheets.

2) A process for the manufacture of a bag with multiple walls, according to one of the subsections of paragraph 1), characterized in that the tubular sections obtained in the known manner, by the preliminary formation of lines of less resistance, and longitudinal incisions in the widths of the various sheets of the bag; by transverse and longitudinal gluing, by application of the sheets one on top of the other, shaping of the tube and separation on the lines of less resistance, are by transverse displacement, first provided with their bottom weld, then with a preliminary breakoff line, the sealing of' the bottom then being embodied with the aid of gluing zones, then a folding over.

A device for application of the said process, consisting of a machine to shape tubular bag components and a machine with transverse advancement to close the bottom of the bag, the latter machine having the following characteristics, considered separately or in combination:

It consists, successively, of a longitudinal welding device, a pre-grooving device, a gluing device and a foldover device.

The longitudinal welding device constitutes a complementary station on a machine with transverse advancement, for placement of bases, of known type, whereof only the grooving, gluing and foldover stations as well as the conveyor device are used to apply the invention, the other work stations of the machine will remain unused.

Nr 1.227.175

Firma die:
Windmöller & Ee.

$F_1$

Fig.4

Firme dite :

Windmüller & Hölscher

2 planches. — Pl. 1

Fig. 2

Fig. 3

Fig. 4

N° 1.227.178

Firme dite:
Windmöller & Hölz.

### Fig. 5

### Fig. 6

Firme dite:
Windmöller & Hölscher

2 planches. — PL II

Fig. 1

Fig. 7

Fig. 9

Fig. 8